STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Vermont Unit | ENVIRONMENTAL DIVISION<br>Docket No. 172-12-12 Vtec<br>and 30-3-12 Vtec |
| Pelkey Final Plat Major Subdivision | **<u>DECISION ON THE MERITS</u>** |

Theodore and Michelle Pelkey ("Applicants") seek to further develop their 11.32± acre parcel of land along Route 128 in the Town of Westford ("Town") by subdividing their property into two lots, revising the existing businesses operated from their property, and constructing and operating a commercial development on the front lot of their subdivided property. When the Town of Westford Development Review Board ("DRB") approved their plans for preliminary and final subdivision plat, planned unit development ("PUD"), conditional use, and site plan review (all of which are the subject of Docket No. 172-12-12 Vtec), as well as their request for an amendment to their previously-issued home occupation permit (which is the subject of Docket No. 30-3-12 Vtec), three concerned neighbors appealed to this Court.[1]

Applicants' proposed developmental changes to their Route 128 property have had a multi-year history before the DRB and then this Court. Initially, the concerned neighbors appealed the DRB preliminary plat approval to this Court. Pursuant to a stipulation between the parties, the Court dismissed that appeal without prejudice to the neighboring appellants' rights to assert the issues raised in the preliminary plat appeal if and when an appeal was filed concerning Applicants' application for final plat approval. See <u>Pelkey Preliminary Plat 2 Lot Major Subdivision</u>, No. 31-3-12 Vtec, slip op. at 1 (Vt. Super Ct. Envtl. Div. July 31, 2012) (Durkin, J.). When the DRB approved Applicants' application for final plat approval, the same individuals—Thomas White, Maurice Rathbun, and Michael Blair—filed an appeal with this Court; that appeal was assigned Docket No. 172-12-12 Vtec. . The Court granted Applicants' motion to dismiss Mr. Rathbun as a party based upon the Court's determination that Mr.

---

[1] At the time of the DRB's preliminary plat approval, the DRB also approved the Applicants' application to amend their home occupation permit. When the neighboring appellants also appealed that determination, that appeal was assigned Docket No. 30-3-12 Vtec.

Rathbun had not shown that he had standing to participate as an appellant in the appeal. Pelkey Final Plat Major Subdivision, No. 172-12-12 Vtec, slip op. at 3 (Vt. Super Ct. Envtl. Div. July 3, 2013) (Durkin, J.).

Mr. White and Mr. Blair ("Appellants") continued to pursue the twenty-two questions raised in their Statement of Questions filed in Docket No. 172-12-12 Vtec,[2] with the assistance of their legal counsel, Chad V. Bonanni, Esq. and Jeffrey M. Messina, Esq. Attorneys Brian P. Monaghan, Esq., and Nicholas T. Stanton, Esq., represented Applicants in these appeals. The Town also chose to participate in these appeals through its attorney, Amanda S.E. Lafferty, Esq.

Applicants subsequently sought summary judgment on all twenty-two of Appellants' Questions in Docket No. 172-12-12 Vtec. In response, Appellants chose to withdraw their Question 1. After considering Applicants' motion and Appellants' defense of their remaining Questions, the Court concluded that Applicants were entitled to summary judgment upon some, but not all, of Appellants' remaining twenty-one Questions; as a result of the Court's decision, Questions 3 through 15 survived Applicants' summary judgment motion. Pelkey Final Plat Major Subdivision, No. 172-12-12 Vtec, slip op. at 8 (Vt. Super Ct. Envtl. Div. July 26, 2013) (Durkin, J.). In response to a motion for reconsideration, the Court reinstated Appellants' Question 19 for resolution at trial. Pelkey Final Plat Major Subdivision, No. 172-12-12 Vtec, slip op. at 3 (Vt. Super Ct. Envtl. Div. Nov. 6, 2013) (Durkin, J.). Thus, as a consequence of these pre-trial decisions, the Court set the remaining Questions in Docket No. 172-12-12 Vtec (Questions 3 through 15 and 19) for trial. The four Questions Appellants raised in Docket No. 30-3-12 Vtec, regarding an amendment to Applicants' previously-issued home occupation permit, were coordinated for trial with Docket No. 172-12-12 Vtec. The coordinated merits hearing was preceded by a site visit and was completed over five days of hearings.

During the trial, Appellants advised that they wished to withdraw two of their Questions in Docket No. 172-12-12 Vtec, noting that they no longer believed that the actual development Applicants proposed would occur within or impact upon steep slopes in the Water Resources Overlay District. Based upon these representations, we do not consider Appellants' Question 3,

---

[2] Michael Blair is the only party who filed an appeal from the DRB decision on the Pelkey's home occupation amendment application (Docket No. 30-3-12 Vtec). His Statement of Questions in that Docket raises four legal issues, all of which we address in the Conclusions of Law section of this Decision.

since that Question challenged conformance to the regulatory provisions prohibiting development on steep slopes or within that Overlay District. We also do not consider Appellants' Question 10, since the proposed development does not call for interior roads or stormwater drainage for such roads.

Based upon the testimony and other evidence presented at trial, including that evidence put into context by the site visit and the assessments of credibility and materiality completed by the Court in the course of its deliberations, the Court renders the Following Findings of Fact, Conclusions of Law, and Judgment Order that accompanies this Merits Decision.

I.    **Findings of Fact:**

A.    **Applicants' property and existing development:**

1. Applicants own and occupy an 11.32± acre parcel of land located on the easterly side of Vermont Route 128, with an address of 2189 VT Route 128, in the Town of Westford, Vermont ("the property"). The property lies in two zoning districts: a small portion of the northeast corner, totaling less than an acre, is located in the Agricultural, Forestry, Rural Residential I Zoning District ("AFR I District"); the remainder lies in the Agricultural, Forestry, Rural Residential II Zoning District ("AFR II District"). See the Town of Westford Zoning Regulations ("Zoning Regulations"), a copy of which was admitted at trial as Pelkey Exhibit C, at §§ 3.5 and 3.6.

2. Applicants' property also lies within two overlay zoning districts: the Water Resources Overlay District ("WRO District") and the Flood Hazard Overlay District ("FHO District"). See Zoning Regulations §§ 3.7 and 3.8. Applicants do not propose any development on any portion of their property that lies within either of these Overlay Districts.

3. Applicants' property is bordered to the west by Route 128 and to the east by the Browns River. Their property is shaped like a boot, with the top of the boot bordering the highway and the sole of the boot bordering the Browns River. See Applicants' Exhibit N.

4. The front portion of Applicants' property, bordered by Route 128, is generally level or gently sloping away from the highway. Several hundred feet from the highway, the lay of the land transitions to a gentle slope upwards towards the east, then levels off and begins a steep slope downwards towards the Browns River.

5. Applicants purchased the property in 2001 after their lot had been created through a subdivision by a prior owner. Applicants thereafter built their home and attached garage; which they use as their primary residence. A copy of the 2001 subdivision map was admitted at trial as Appellants' Exhibit 8.

6. Shortly thereafter, Applicants built a second, unattached garage on their property near the southeastern corner of the existing attached garage. Mr. Pelkey uses this second garage to store and work on excavation equipment that he uses in his excavation business on customers' property in and around Town.

7. This second garage is located 23.95± feet from the southern boundary of Applicants' lot.

8. There are existing trees that provide some, but not complete, screening of Applicants' buildings from the property immediately adjacent to the south.

9. Mr. Pelkey then constructed a third garage to the rear, northeastern corner of his second garage. This third garage has been called a "temporary" garage, even though Applicants did not specify at trial when it may be removed. It is constructed of a metal frame and a fabric-type material for its exterior walls. This temporary garage is also used to store Mr. Pelkey's excavation equipment and some other personal items.

10. Trees are also located along the northern and the western boundaries, the latter of which parallels Route 128. The existing trees located parallel to Route 128 provide some, but not complete screening of Applicants' buildings for Route 128 travelers.

11. There is a small lawn area behind Applicants' home that is somewhat level. Then, the property slopes, sometimes steeply, towards the east, until its eastern boundary along the Browns River. For most of this steep slope, Applicants' lot is forested with trees and brush that provide a buffer to the River. See Pelkey Exhibit N.

### B. Applicants' proposed development:

12. Applicants propose to subdivide their existing lot into two lots. The proposed Lot 1 would consist of 2.05± acres and include the western-most lands of Applicants' property. The proposed Lot 2 would contain all of Applicants' remaining lands, totaling 9.27± acres.

13. The proposed Lot 1 would include Applicants' entire existing frontage on Route 128. Access to the proposed Lot 2 would be over an easement encumbering Lot 1. Access to both

proposed lots would be via a shared driveway running parallel to the two lots' southern boundary. Applicants propose to expand the western portion of their existing driveway to accommodate the traffic from both lots.

### i. Proposed Lot 1 and its uses:

14. Applicants propose to construct a 4,000 square foot building on Lot 1, no more than 35 feet tall, to host two commercial uses. Mr. Pelkey already operates these commercial enterprises through his limited liability company—Ted's Truck & Trailer Repair, LLC—at separate locations outside of Town; he wishes to relocate these businesses to be closer to his home.

15. The exterior of the new building is proposed to be vinyl sided that will be earth tone in color and have an appearance similar to the exterior of Applicants' existing home and attached garage.

16. One of Mr. Pelkey's existing businesses involves inspection and minor repair of tanker trailers seeking federal EPA certification. Mr. Pelkey currently operates this business under Ted's Truck & Trailer Repair, LLC in an industrial park in the nearby town of Swanton. Mr. Pelkey also operates his excavation and monofilament spool recycling business through this limited liability company.

17. Applicants propose to relocate this inspection business to a portion of the new building on Lot 1. As currently operated and as proposed to be operated in the new Lot 1 building, the tanker repair business would be limited to the following activities:

a. Inspecting and certifying tanker trailers capable of carrying up to 10,000 gallons of petroleum product pursuant to federal guidelines. The tanker trailers and the trucks used to transport them are 53 feet long and 8 feet wide; the trailers themselves are 43 feet long and 8 feet wide.

b. Conducting one-year and five-year tanker trailer truck inspections, as required by federal law. The five-year inspection is a more stringent process and requires entry into the tankers to complete all necessary inspections. Mr. Pelkey and his employees will inspect and repair about 36 tanker trailers per year, with no more than four tanker trailers to be on Lot 1 at any given time. They intend to work on one tanker trailer at a time with all work conducted inside the new building. Trailers not being worked on will be parked on Lot 1 to await inspection or pick up by their owners.

c. Mr. Pelkey and his employees will use pressurized air, manometers, and dish soap to test for leaks in the tankers. Their past practice has been to receive assurances from

the trailer owners that the tankers arrive for inspection empty of product and vented of any remaining fumes. When a tanker arrives at his business with product remnants, Mr. Pelkey and his employees remove the product and store it on site for lawful disposal.

d. Mr. Pelkey does not have a designated hazardous materials spill response procedure, but has pledged to establish such a procedure should his planned development receive all necessary approvals.

e. If inspection reveals a leak in a tanker trailer, Mr. Pelkey will arrange with the tanker owner to have it removed from the site and repaired by another contractor. Mr. Pelkey does not intend to complete anything other than minor repairs on tanker trailers he inspects and pledges to not take in trucks for structural or mechanical repair. The only automotive repair he will conduct in the proposed new building will be repairs on his own vehicles and the occasional Vermont DMV inspection for a neighbor's vehicle.

18. Mr. Pelkey also intends to relocate a second pre-existing business to the building on Lot 1. This second business involves recycling large spools used for monofilament fiber that is manufactured in Williston, Vermont and used by manufacturers throughout the world.

19. This business recycles these monofilament spools by receiving the mostly used spools, removing the remaining filament, cleaning the spools, and returning the spools to the monofilament manufacturer for re-sale and re-use.

20. Nearly empty spools are shipped by manufacturers from all over the world and packaged in boxes that hold about 90 spools per box. The spools vary in size, but most are about ten inches tall and ten inches in diameter.

21. Once the spools are emptied and cleaned, they are placed in boxes with a height, width, and depth of about four feet and shipped back to the Williston manufacturer for re-use. The monofilament removed from the used spools is also placed in these large, four-foot boxes and shipped back to the Williston manufacturer.

22. All operations involved in these businesses will be conducted inside the new building; there will be no business activities conducted outside of the building, other than the parking of employee vehicles and tanker trailers awaiting inspection or pick up. There will be no more than ten vehicles or trailers parked on Lot 1 at any one time.

23. Mr. Pelkey's limited liability company, Ted's Truck & Trailer Repair, LLC, will operate these two businesses, employing no more than ten employees, including Mr. Pelkey.

24. Mr. Pelkey will use a "day truck" that he owns to move the tanker trailers into and out of the building.

25. Applicants have pledged that they will limit the hours of operation for their businesses to Monday through Friday, 8:00 AM to 4:00 PM, with only personal, non-business activities occurring on Saturdays.

26. There will not be any signs on site for these businesses. The only lighting will be downcast and for security purposes.

27. The new building on Lot 1 is proposed to have two large overhead doors, one of which would accommodate tanker trailers brought inside for inspection and minor repairs. The second overhead door will be located in front of a loading dock with a sunken entrance ramp for receipt of the to-be-recycled spools and supplies. Due to the separate elevations of the entrance ramps, the approaches to the two overhead doors will be separated by a concrete wall.

28. Potable water will be supplied to the building by an on-site well. The building will have a bathroom for employee use. The resulting wastewater will be treated by an on-site wastewater treatment system. No petroleum products, fuel oil, or other hazardous materials will be allowed to enter the on-site wastewater treatment system. As of trial, Applicants had not yet secured a permit for their proposed on-site water supply and wastewater treatment systems.

29. Parking on Lot 1 will occur on a gravel parking area to be constructed on the southern portion of that Lot, adjacent to the proposed building on its south, east, and west sides. The gravel parking area will cover 38,455 square feet of land which will result in the parking area covering 43% of Lot 1.

30. The proposed parking area is depicted on Applicants' site plan, a copy of which was admitted at trial as Pelkey Exhibit H.

31. Vehicles, including employee vehicles and tanker trailers being delivered for inspection, will access this parking area via the shared driveway. Tractors used to move the tanker trailers into the building for inspection will use a large portion of the parking area to turn and back the tanker trailers into the building. Trucks delivering the spools and supplies to the Lot 1 building will follow a similar procedure.

**ii. Proposed Lot 2 and its uses:**

32. Lot 2 will consist of all of Applicants' remaining lands, totaling 9.27± acres. This land is mostly level or slightly sloping in the vicinity of Applicants' existing home and garages, but slopes, sometimes steeply, towards the eastern boundary of the proposed Lot 2 along the Browns River. The area of Lot 2 closest to Applicants' home is mostly cleared, but thick trees and vegetation cover the remainder of Lot 2, particularly along the Browns River.

33. There are pre-existing trees along the northern and southern boundaries of both proposed Lots.

34. There are no existing trees or proposed landscaping between Lots 1 and 2.

35. There are no new buildings proposed for Lot 2. Applicants intend to continue to use their home and attached garage as their primary residence and solely for personal use; no business activities will occur within the home.

36. Applicants will continue to use the existing additional garages (the detached second garage and the third, "temporary" garage) for storage of equipment used in their limited liability company's excavation business.

37. Applicants also wish to use a portion of Lot 2 for the temporary storage of loam, gravel, and other earthen materials. Mr. Pelkey at times represented that these piles of earthen material would only be stored on site for somewhat short durations of times, in between uses on separate job sites. He also suggested that the material would consist of one mound that would be no more than six feet high. When pressed, however, Mr. Pelkey was noncommittal on these points. He also chose not to specify the specific location for these earthen mound(s) and declined to specify any shielding or landscaped screening for these mounds.

**iii. Reserved conservation area:**

38. Applicants propose to restrict any further development on a 3.83± acre portion of Lot 2. This area to be preserved is identified as "open space" and is denoted by hatched markings on a map entitled "Boundary Plat," a copy of which was admitted at trial as Pelkey Exhibit N. The area delineated as "open space" takes up the heel and toe portion of Applicants' boot-shaped property. At its eastern boundary, the open space area runs along the Browns River.

39. The open space area is heavily wooded, especially in the vicinity of the Browns River. While it consists mostly of steep slopes, the open space provides a buffer zone to protect the River and its banks.

### iv. Requested waivers from zoning requirements:

40. Applicants requested from the DRB, and from this Court on appeal, that the following waivers from requirements within the Zoning Regulations be approved in connection with the review and approval of their Mixed Use PUD application:

    a. Waiver of the minimum lot size requirement for the AFR 2 District (5 acres, per Zoning Regulations § 3.6.4), so that the proposed Lot 1, consisting of 2.05± acres, may be allowed;

    b. Waiver of the requirement that all newly created lots include 250 feet of road frontage (also per Zoning Regulations § 3.6.4), given that Lot 2, while it will not have any road frontage, will be served by the proposed shared driveway; and

    **c.** Waiver of the side yard setback minimum within the AFR 2 District (which is 50 feet, per Zoning Regulations § 3.6.4), so that the pre-existing detached garage on the proposed Lot 2, which is 23.95± feet away from Applicants' southerly boundary, would no longer be regarded as non-conforming.

### C. Neighborhood surrounding Applicants' property:

41. The 2001 subdivision that created Applicants' parcel also created an adjoining lot of 10.1± acres. See May 3, 2001 subdivision map, Appellants' Exhibit 8.

42. This adjoining lot is currently owned by Mr. and Mrs. Koll-Bensen. Neither Mr. nor Mrs. Koll-Bensen has chosen to participate in these land use appeals.

43. The Koll-Bensen lot and the next several lots to the south have been developed for residential and mixed uses, including home occupations. The homes on each of these residential lots are generally set back from Route 128 and have large front lawns.

44. The Town of Westford is generally rural in character, although the lands that are along Route 128, particularly in the vicinity of Applicants' property, represent some of the most heavily developed areas in the Town.

45. The area in the immediate vicinity of Applicants' property enjoys large vistas of the type that often contribute to the beauty of towns in Northern Vermont. To the north along Route 128, a traveler soon enters the center of Town; to the south along Route 128, the vistas

become less broad and many of the existing buildings are located closer to the highway than Applicants' home and the homes of their immediate neighbors.

46. North of Applicants' property are two residential properties, although the property immediately north and west of Applicants' property is occupied by a 4,000 square foot commercial building, located about as close to Route 128 as Applicants' proposed Lot 1 building. This neighboring building is used to construct and repair wooden boats and is depicted on Appellants' Exhibit 8.

47. There are several other properties in the area that serve commercial uses. In particular, properties owned by Mr. and Mrs. Mathieu and Mathieu Properties, LLC, are occupied by a large barn, a large commercial building, and a large parking area used as a school bus depot. The Mathieu commercial building hosts offices and repair facilities for a school bus business.

48. Appellant Blair and his wife own and occupy the property immediately adjacent to Applicants' southern neighbor. The Blair property is improved with a 1,750 square foot home and a 4,896 square foot accessory building that the Blairs devote to mixed uses. Their home and accessory building are set far back on their lot; a portion of the front of their lot is fenced and used as a grazing area for horses. The lay of their land partially obscures the home and accessory building from the views of travelers along Route 128.

49. The Blairs refer to their accessory building as a barn. Mr. Blair uses a portion of their barn (1,275 square feet) to conduct his auto repair business. That business is now low in volume and may be more accurately described as a hobby than as a profession. Mr. Blair has a municipal home occupation permit to conduct his auto repair business within their barn.

50. The Blairs use the remainder of their barn (3,621 square feet) to board horses and a variety of other animals.

51. There are several other businesses operating on properties along Route 128 within an area stretching four miles to the south of Applicants' property. Some of those businesses are operated as home occupations by individuals who own and reside in the residence on site; other businesses are located in commercial buildings that are not associated with on-site residences.

52. One such business is known as Danish Woolen Delights and is operated inside a 10,200 square foot commercial building; there is also a 2,300 square foot home on that property. The Danish Woolen Delights business has thirty-five employees and generates traffic from delivery trucks, visitors, and employees that account for about 60 one-way vehicle trips per day.

53. Another business operated on property adjacent to Route 128 is known as Rovers North. See Pelkey Exhibit S. This business repairs Range Rover vehicles, although the auto repair portion of their business has decreased. The business also conducts training for off-road driving of Range Rover vehicles for both private and military personnel. The Rovers North business currently employs about twenty-five people that work or visit their Route 128 facilities.

## II. **Conclusions of Law**

Given that the two appeals pending before this Court concern various applications for municipal permits, 10 V.S.A. § 8504(h) and V.R.E.C.P. 5(g) direct us to conduct a de novo review of the factual and legal issues relevant to those applications. Our review may not take into consideration the determinations made by the appropriate municipal panel that rendered the decisions appealed, but neither may we disturb the determinations made by that panel that have not been challenged by an appellant in their statement of questions. See In re Rodriques Variance Application, No. 212-9-08 Vtec, slip op. at 10 (Vt. Envtl. Ct. Apr. 27, 2010) (Durkin, J.) (limiting review of a variance application to two of the five statutory variance criteria because those were the only criteria preserved on appeal). We therefore consider the legal issues remaining at the time of trial from Appellants' Statement of Questions in each appeal.

### A. Docket No. 172-12-12 Vtec: final subdivision plat, Mixed Use PUD, conditional use, and site plan review.

This Docket concerns an appeal of applications submitted by Applicants and addressed in a single DRB decision issued on November 14, 2012, a copy of which was admitted at trial for reference purposes as Town Exhibit iii. The following twelve Questions raise legal challenges to the final plat, subdivision, Mixed Use PUD, conditional use, and site plan approval applications addressed in the November 14, 2012 DRB decision. We address these Questions in the order in which they were presented at trial.

*Question 4: Conformance with Subdivision Regulations § 6.1.5 and Zoning Regulations § 4.7.3(4) Concerning Compliance with Objectives of Town Plan and Zoning and Subdivision Regulations.*

By their Question 4, Appellants raise a broad series of challenges to Applicants' development proposals. Subdivision Reg. § 6.1.5 directs that a "proposed development shall demonstrate compliance with the objectives of the Westford Town Plan, Zoning Ordinance [sic[3]], Capital Budget and Program, Official Map, and other bylaws then in effect." Id. Zoning Reg. § 4.7.3(4) states nearly identical directives by stating that "[a]ll Mixed Use PUDs shall . . . [be] consistent with the objectives of the Town Plan, the Town Subdivision Regulations and the Capital Budget Program." Id.

Appellants referenced many provisions within the specified documents to support their belief that Applicants' proposed development fails to conform to the Regulation's stated objectives. At the heart of their arguments are three general assertions: that Applicants' proposed development will: (1) adversely impact upon prime agricultural soils; (2) adversely impact upon the existing open space vistas and visual resources of the surrounding area; and (3) not conform to the specific requirements of both the Subdivision and Zoning Regulations. To address these legal issues, we must first review the nature of the proposed development.

Applicants' proposed development seeks to concentrate development on the front portion of their property—the proposed Lot 1—so that the natural areas on the rear portion of their property—the proposed Lot 2, located within the WRO and FHO Overlay Districts and bordered by the Browns River—may be preserved. In fact, in addition to avoiding development on the steep slopes at the rear of their property, Applicants have limited the proposed development to Lot 1 in order to permanently preserve and restrict from development a 3.83± acre conservation area on Lot 2.

Applicants do not dispute that the lands within their proposed Lot 1 contain soils identified as prime agricultural soils, nor do they dispute that the Town Plan, Zoning Regulations, and Subdivision Regulations speak to the importance of preserving prime agricultural soils. But we do not understand that any regulatory provisions establish an

---

[3] The applicable municipal ordinance is titled "Town of Westford Zoning Regulations"; we refer to that ordinance throughout this Decision as the Zoning Regulations.

absolute prohibition against development upon prime agricultural soils.  Rather, the Town Plan speaks to the importance of protecting natural resources and preserving their use for agricultural and silvicultural purposes.  Town of Westford Town Plan §§ 3.4, 4.3.2, and 10.8.

Given the previously-permitted development of the properties now owned by Applicants and their neighbors, we conclude that the proposed development will not cause further degradation of the agricultural soils and other important natural resources on their property.  While the lands along Route 128 now contain prime agricultural soils, the residential, home occupation, and commercial developments that have already been allowed in this immediate neighborhood for the last thirty or more years have made agricultural uses in this area impractical, and perhaps impossible.  Many of these lots are less than twelve acres in size, including Applicants' property.  The separate ownership of small parcels has and will continue to act as a practical barrier to an agricultural use of these prime agricultural soils, as is evidenced by the lack of agricultural use of any of the nearby land along Route 128.

If Applicants were proposing to develop a much larger tract of land containing prime agricultural soils, similar to the area several miles south on Route 128 where the agricultural soils continue to be used for agricultural purposes, our conclusions here would be different.  But Applicants' property, and that of all of their immediate neighbors, have already been subdivided into smaller lots and have been the subject of consistent development and residential, home occupation, and commercial uses.  Furthermore, Applicants' plans propose to preserve the lands within the WRO and FHO Districts, which are now and will remain heavily forested.  For these reasons, we conclude that Applicants' proposed development does not conflict with the applicable objectives of the Town Plan or Zoning and Subdivision Regulations regarding the preservation of natural resources for agricultural and silvicultural purposes.

As to Appellants second assertion, we found credible and convincing the testimony by Applicants' engineer that the proposed development conforms to and complements several other objectives of the Town Plan and Zoning and Subdivision Regulations regarding existing open space vistas and visual resources of the surrounding area.  These documents memorialize that the Town is specifically concerned with the preservation of the Town's rural character and

-13-

that the Town has designated areas along Route 128 for commercial and other development, so as to relieve the developmental pressures on the more rural areas of the Town.

Every parcel of land adjoining or near to Applicants' property has been the subject of residential or commercial development; we were not made aware during the trial of any neighboring parcel that has remained void of development. By proposing development along Route 128, an area already consistently developed, Applicants have presented a plan that conforms to the specific objectives contained in Articles 3 and 4 of the Town Plan. While we recognize that the area along Route 128 does contain scenic vistas, we conclude that the addition of Applicants' proposed development will not cause a significant adverse impact to the existing scenic vistas.

As to Appellants third and final assertion, Applicants concede that their development does not conform to certain specific regulatory requirements of the Subdivision and Zoning Regulations, particularly the dimensional requirements in both Regulations. If these regulatory requirements were unconditional and without exception, our analysis could end here, with an outright denial of the pending applications. But the Zoning and Subdivision Regulations are not so limiting, since specific provisions allow for Mixed Use PUD developments, which are specifically allowed to deviate from dimensional and other regulatory requirements. See Zoning Reg. § 4.7 and Subdivision Reg. § 6.0 (Planning Standards).

We therefore conclude that Applicants' proposed development conforms to the applicable provisions of the Zoning and Subdivision Regulations, as detailed below in response to Questions concerning conformance to specific regulatory provisions. For all these reasons, we answer Appellants' Question 4 in the affirmative and conclude that Applicants' development as proposed complies with the objectives stated in the Town Plan, Subdivision Regulations, Zoning Regulations, and other applicable regulatory provisions.

*Question 5*: *Compatibility with surrounding properties pursuant to Subdivision Regulations § 6.1.6.*

By their Question 5, Appellants challenge the proposed development's compatibility with surrounding properties. Subdivision Reg. § 6.1.6 requires that Applicants' proposed development "demonstrate compatibility with surrounding properties and the lot

configuration, road network, the natural features, protected open space and public uses on those properties."

To address this issue, we first review the nature of the surrounding properties. As discussed above, Applicants and their neighbors have developed the properties along this section of Route 128 with homes, home occupation buildings, and commercial enterprises. This area enjoys scenic vistas, although nearly all neighborhood properties also include views of other area developments. The credible evidence presented by all parties at trial confirmed that the area around Applicants' proposed development is one of the most heavily developed portions of Town, particularly because of its mix of residential, commercial, and light industrial buildings and uses. This pattern of development appears in keeping with the objectives contained in the Zoning and Subdivision Regulations to protect the more rural areas of Town and to encourage commercial development in this portion of Town that adjoins Route 128.

We must also review the nature of the proposed development itself. Applicants' new development and uses for their property are best identified as small scale industry and automotive repair uses, which are allowable as conditional uses in the AFR II District. See Zoning Reg. § 3.6.3. They also propose to continue to use a portion of their property (Lot 2) as their residence and site of a home occupation.

As discussed above, Applicants propose to develop the front section of their property, a pattern evident among several area properties along Route 128. In fact, Applicants' immediate neighbor to the north uses a large commercial building for wooden boat building and repairs that is nearly as close to Route 128 as the development Applicants now propose. Furthermore, Applicants propose additional plantings along Route 128 and other landscaping that, once established, will provide sufficient screening for their proposed development. While other area buildings are set farther back or better screened from Route 128 than the development Applicants now propose, several of those buildings are used for commercial purposes.

For all these reasons, we conclude that Applicants' proposed subdivision and development conforms to Subdivision Reg. § 6.1.6.

*Question 6*:    *Conformance to dimensional requirements of Zoning Regulations §§ 3.6.4, 4.7.3(8), and 4.7.5.*

By their Question 6, Appellants raise challenges to the dimension of Applicants' development proposal.  It is true that Applicants' proposed development suffers from several conflicts with the conventional density and dimensional requirements for the applicable zoning district.[4]  Those conflicts would prove fatal for the pending applications, were their purpose to seek approval of a conventional development.  But Applicants have designed their development as a Mixed Use PUD, and have sought specific waivers for three dimensional requirements that they would otherwise violate.  Because the dimensional requirements that are applicable to a conventional development in the AFR I & II Districts do not apply to Mixed Use PUDs (with one threshold exception), we do not analyze the conformance of Applicants' proposed development to Zoning Reg. § 3.6.4.

We therefore review the proposed development under the dimensional standards for Mixed Use PUDs.  In addition to the Subdivision Regulations, PUD developers must satisfy conditions established under Zoning Reg. § 4.7.3 and dimensional requirements established under Zoning Reg. § 4.7.5.  Among these conditions, the setback area "shall be a minimum of fifty feet unless waived by the [DRB] . . ."  Zoning Reg. §§ 4.7.3(8), 4.7.5.  As to lot and project size, § 4.7.5 establishes a minimum of 0.5 acres per structure or unit and a minimum of 2 units or lots.  Zoning Reg. § 4.7.5.

Applicants' proposed development is presented as a Mixed Use PUD and therefore must satisfy the specific provisions referenced in Appellants' Question 6.  Zoning Reg. § 4.7.3(8) provides for a minimum fifty-foot setback "along the perimeter of the Mixed Use PUD, unless waived by the Development Review Board [and this Court, in the event of an appeal] in the Town Common, Town Village or Town Center Districts."  This provision does not specifically provide for setback waivers in the AFR II District, but § 4.7.5 provides that the minimum 50-foot

---

[4]  Since Applicants' property lies in two zoning districts, we look to the Zoning Regulations definition of density, which directs that "[w]here a lot is located in two or more zoning districts, the density for the entire lot shall be the aggregate of the allowable density of each portion that is in a separate district."  Zoning Reg. § 8.2.  Since only a small portion of Applicants' 11.32± acre parcel is in the AFR I District (less than one acre) and the remainder of their lot is located in the AFR II District, we look to the density and dimensional requirements for the latter District as governing for Applicants' property, which are detailed in Zoning Reg. § 3.6.4.

side and rear yard setbacks may be "reduced by the Development Review Board."[5]  We conclude that this Court has that same authority in the event of an appeal.  See In re Torres, 154 Vt. 233, 235–36 (1990) (noting that the power of the superior court extends as far as the power of the municipal panel).  We therefore determine that Applicants are entitled to request and receive certain waivers, provided that they satisfy the applicable waiver provisions discussed below.

Applicants submitted three waiver requests to the DRB and renewed those three requests in our de novo proceedings.  Their three waiver requests are:

a. A waiver of the conventional minimum lot size of 5 acres, so that they may be allowed to create their Lot 1 of 2.05±, with their Lot 2 containing all of their remaining 9.27± acres.  Given that Mixed Use PUD lots created in the AFR II District may be as small as a half an acre, pursuant to Zoning Reg. § 4.7.5(1), we conclude that Applicants are allowed to create a 2.05± acre lot within their proposed Mixed Use PUD.

b. A waiver of the minimum road frontage of 250 feet, so that they may be allowed to create their Lot 2, which has no road frontage, but which will be served by a shared driveway easement that runs in an east-west direct along the southern portion of Lot 1.  See Pelkey Exhibit H.  Applicants assert that by allowing Lot 1 to occupy the entirety of road frontage from their existing property, they are able to subdivide in a manner that preserves as much of the natural lands in the rear of their property, particularly that portion of their land that is within the WRO and FHO Districts.  For this reason, we conclude that Applicants are allowed to create Lot 2 without road frontage.

c. A waiver of the conventional side yard setback of 25 feet, so that their existing second garage may be regarded as permitted and conforming despite its location 23.95 feet from the southern boundary line.  Applicants secured a zoning permit for this second garage and there was no claim at trial that the garage is in violation of that permit.  But Applicants asserted at trial that this second garage constituted a pre-existing non-conforming structure in regards to its setback from the southern boundary.  That assertion was undisputed at trial and we therefore adopt it as our own legal determination.

Municipalities are encouraged to authorize development that may not conform to all the conventional land use regulations, so as to "permit flexibility in the application" and implementation of the general purposes and goals of municipal land use regulation.  See 24 V.S.A. § 4417(a), with reference to the general purposes and goals established by 24 V.S.A.

---

[5] Section 4.7.3(8) does, however, provide that "[g]reater setback distances and additional screening for structures and parking areas and other development along the perimeter of the Mixed Use PUD and between the development areas and protected resource lands in the common open spaces areas may be required."

§ 4302. The Town of Westford, following the encouragement from § 4417(a), authorized PUDs in general and Mixed Use PUDs in particular. See Zoning Reg. §§ 4.5 and 4.7, respectively. The purposes of allowing Mixed Use PUDs are "to encourage flexibility in design, the most appropriate use of land, . . . and the preservation of natural resources, including lands within the Water Resources Overlay District, primary agricultural and forestry soils, . . . wildlife habitat, [and] significant natural areas." Zoning Reg. § 4.7.1. As such, zoning requirement waivers are allowed under both the Subdivision Regulations (§ 8.4) and Zoning Regulations (§ 4.7).

Waivers are specifically allowed in connection with subdivisions when, in the judgment of the DRB, or this Court on appeal, the "substantive and procedural provisions of [the Subdivision] regulations . . . are not requisite in the interests of the public health, safety and general welfare or necessary to effectuate the goals" and stated purposes of the Subdivision and Zoning Regulations. Subdivision Reg. § 8.4. That provision goes on to explain that conditions may be placed upon any waiver approval that are necessary to "secure substantially the objectives of the requirements so waived [and that] [n]o such waiver may be granted if it would have the effect of nullifying the intent and purpose of [the Subdivision] Regulations, Town Plan, Zoning Regulations, Capital Budget and Program, Official Map, other Town bylaws and ordinances, or violates any provision thereof." Id. With this directive in mind, we have conditioned our granting of the waivers Applicants request upon the specific Conditions listed below.

We conclude that the credible evidence presented supports the granting of the three requested waivers, particularly since the waivers are requested in support of the proposed Mixed Use PUD. As discussed above, the "reduction" in lot size is really not a reduction as lots as small as half an acre are allowed as part of a Mixed Use PUD. See Zoning Regulations § 4.7.5(1). The second requested waiver, from the road frontage requirement, allows Applicants to concentrate their development on the front of their property so that the natural areas to the rear of the property, including lands within the WRO and FHO Districts, may be preserved. We find that a waiver from the road frontage requirement would therefore encourage the most appropriate use of the property, in conformance with Zoning Reg. § 4.7.1. Lastly, the third requested waiver, from the minimum side yard setback, represents a setback

waiver amounting to 1.05 inches for a building (the second garage) that has existed in this location for more than a decade. We find that, in light of the pre-existing nature of the second garage, granting this waiver encourages flexibility in design, pursuant to Zoning Reg. § 4.7.1. Although Appellants expressed concerns about their ability to see portions of this building, no credible evidence was presented that the impact upon them is measurably increased because the building is about an inch closer to the common boundary line. For all these reasons, we **GRANT** the requested waivers, subject to the Conditions listed below.

For all these reasons, particularly in light of the nature of Applicants' development (Mixed Use PUD) and the waivers granted above and the conditions recited below, we conclude that Applicants development as proposed conforms to the applicable dimensional requirements in the Zoning Regulations.

*Question 7: Conformance to density requirements of Subdivision Regulations §§ 6.1.7 and 7.10.5 and Zoning Regulations §§ 3.5.4, 3.6.4, 4.7.3(3), and 8.2.*

By their Question 7, Appellants raise challenges to the proposed development's conformance with density requirements. As noted above at footnote 4, "density" is specifically defined as follows in the Zoning Regulations (§ 8.2):

> Density – The number of acres or square feet of land that are required for a given number of units, uses, or structures. Where a lot is located in two or more zoning districts, the density for the entire lot shall be the aggregate of the allowable density of each portion that is in a separate district.

As a primary matter, the density and other requirements for a conventional subdivision or development do not pertain when, as here, the development is proposed as a Mixed Use PUD. Subdivision Reg. § 7.10.5; Zoning Reg. § 4.7.3(3). As noted above, we have already determined that Applicants' proposed Mixed Use PUD conforms to those regulatory provisions.

We first address Applicants' proposal under the Subdivision Regulations. Section 6.1.7 requires that the site of the proposed subdivision "shall be suitable for the proposed project and demonstrate compliance with any applicable use, dimensional and density requirements . . . ." Subdivision Reg. § 6.1.7. PUD developers must satisfy a threshold showing that their proposed development does not "exceed the number [of allowable units, uses, or lots] which could be permitted . . . if the land were subdivided into lots in conformance with the zoning and

subdivision regulations for the districts in which such land is situated." Zoning Reg. § 4.7.3(3). A conventional subdivision of Applicants' 11.32± acre parcel would be allowed to create two lots, since that acreage would accommodate two lots that meet the conventional minimum lot size in the AFR II District of 5 acres. See Zoning Reg. § 3.6.4(1). We therefore conclude that Applicants' proposed Mixed Use PUD does not ask for authority to create more lots than would be allowed, were a conventional subdivision being proposed. We therefore also conclude that Applicants' proposed Mixed Use PUD satisfies the question of conformance with Subdivision Regulations § 6.1.7.

Next, § 7.10.5(1) requires lots to be appropriately sized "to comply with zoning setback standards, standards for the protection of natural resources, aesthetic considerations, and other standards of these regulations." The section further directs that densities in the Zoning Regulations are a minimum standard and that "[g]iven the physical limitations to development on land in the town and the significant natural resources in the town that are a high priority for protection in the Town Plan, lower densities may be appropriate in some cases." Subdivision Reg. § 7.10.5(1). Section 7.10.5(3) further directs that a Mixed Use PUD development may provide for "smaller lots . . . if such lots meet other standards of [the Subdivision] regulations, and the Zoning Regulations and if smaller lots would enable greater protection of natural resources identified in the Town Plan and/or would maximize land for continued productive agricultural or forestry use."

As we have already noted, Applicants' proposed development provides for continued protection of natural and forested lands within the WRO and FHO Districts. We do not agree with Appellants' assertion that Applicants' proposed development adversely impacts upon agricultural lands, for while the front portion of Applicants' property (where they propose the creation and development of Lot 1) contains prime agricultural soils, the use of those soils for agricultural purposes has already been negated by the residential subdivision and development that was approved nearly thirteen years ago. The approval of Applicants' development will not make an agricultural use of that portion of their property any less likely, given the development that has already been permitted on Applicants' and their neighbors' properties. For all these reasons, we conclude that the configuration of Applicants' proposed Lots 1 and 2 provide for

greater protection of the natural and forested areas within the WRO and FHO Districts and does not further jeopardize prime agricultural soils. We therefore conclude that Applicants' proposed subdivision conforms to Subdivision Reg. § 7.10.5(3).

We next address Applicants' proposal under the Zoning Regulations. As a primary matter, Zoning Regulations §§ 3.5.4 & 3.6.4 apply to conditional uses, and, as stated above, Applicants have designed their development as a Mixed Use PUD. Because the dimensional requirements that are applicable to a conventional development in the AFR I & II Districts do not generally apply to Mixed Use PUDs, we do not analyze the conformance of Applicants' proposed development to Zoning Reg. §§ 3.5.4 & 3.6.4. We therefore address Applicants' proposed development under § 4.7.3(3).

Section 4.7.3 provides 10 enumerated general conditions for approval of a Mixed Use PUD, but Appellants only challenge Applicants' proposal under subsection 3. Section 4.7.3(3) limits "[t]he total number of allowable units and amount of spaces in other uses within the Mixed Use PUD" to "the number which could be permitted in the [DRB's] judgment if the land were subdivided into lots in conformance with the zoning and subdivision regulations for the district in which the land is situated."

Our analysis is made somewhat more complicated by the fact that Applicants' property lies in two different zoning districts with differing density requirements. A small portion (less than one acre) of Applicants' property lies in the AFR 1 District, which directs that lots have a minimum size of ten acres and minimum side- and rear-yard setbacks of 35 feet. Zoning Reg. § 3.5.4. The vast majority (nearly 11 acres) of Applicants' property lies in the AFR 2 District, which allows for lots of five or more acres and minimum side- and rear-yard setbacks of 25 feet. Zoning Reg. § 3.6.4. We must therefore determine which of these Regulations applies.

The Zoning Regulations do not include a specific provision for determining the applicability of density requirements when a property lies in multiple districts. However, as noted above and in footnote 4, the definitional section of the Zoning Regulations, in providing a definition for "density," includes the following explanation: "[w]here a lot is located in two or more zoning districts, the density for the entire lot shall be the aggregate of the allowable density of each portion that is in a separate district." Zoning Reg. § 8.2. We further note that

none of the proposed development occurs in or near the AFR I District. Given the small portion of Applicants' property in that District and the complete absence of development in that District, we conclude that the density provisions for the AFR II District govern Applicants' proposed development and Zoning Regulations § 3.6.4(2) is the relevant provision. Section 3.6.4(2) establishes a minimum density of 5 acres for each dwelling or structure. As stated above, this section authorizes Applicants' proposal to divide their 11.32± acre parcel into two lots, since that acreage would accommodate two lots that meet the conventional minimum lot size in the AFR II District of 5 acres.

Based upon the credible evidence presented, and the legal conclusions summarized above, we conclude that the proposed subdivision and development conforms to the density and other site plan requirements codified in Zoning Regulations § 4.7.3. In light of the legal conclusions rendered above, we answer Appellants' Question 7 in the affirmative: that Applicants' subdivision and development conforms to the density requirements of Subdivision Regulations §§ 6.1.7 and 7.10.5 and Zoning Regulations §§ 3.5.4, 3.6.4, 4.7.3(3), and 8.2.

*Question 8:  Conformance to Subdivision Regulations §§ 6.2.1 and 6.2.2 and Zoning Regulations §§ 3.6.6(1) and 4.7.3(5).*

By their Question 8, Appellants challenge the conformance of Applicants' development proposal with standards seeking to protect natural resources. Section 6.2 of the Subdivision Regulations establishes planning standards for the AFR I, AFR II, and Rural Residential Zoning Districts. In particular, subsection 1 provides that all components of a development must retain and protect certain "significant natural resources designated in the Town Plan as protected open space for their productive agricultural or forestry use," specifically "[p]rimary agricultural soils[; p]rimary forestry soils[; c]rop land, hay land, or pasture land[; and l]and under a forestry management plan." Zoning Reg. § 6.2.1.

As we have already discussed, the front portion of Applicants' property contains what have been identified as primary agricultural soils. The rear portion of their property contains natural areas that Applicants have pledged will remain undeveloped, including forested lands and lands within the WRO and FHO Districts. Also already discussed, prior permitted development on and near Applicants' property has made the productive use of those prime

agricultural soils untenable. No credible evidence was presented at trial that the front portion of Applicants' property could be put to any form of productive agricultural use, even though Appellants continued to pursue this Question at trial. For all these reasons, we conclude that Applicants' proposed subdivision and development conforms to Zoning Reg. § 6.2.1.

Section 6.2.2 provides similar protections for "significant natural resources" that are identified as "significant natural areas, greenways, and wildlife habitat." Zoning Reg. § 6.2.2. Given that Applicants propose no development on the rear portion of their lot, which is the only area where these "significant natural resources" may be found, and because Applicants will permanently restrict development of this area, we conclude that Applicants' proposed subdivision and development conforms to Zoning Regulations § 6.2.2.

Turning to the Zoning Regulations, § 3.6.6(1) provides "special provisions" applicable to AFR II District, stating that:

> The siting of buildings on parcels shall minimize the appearance of strip development along roads, use the least amount of land possible, and maximize the amount of contiguous natural resource lands, including actively farmed primary agricultural soils, primary forest soils, wildlife habitat, greenways, and significant natural areas. Development shall be carefully integrated into resource lands and be sited so as to retain the appearance of predominantly open space. To accomplish these objectives, buildings can be sited at the edge of resource lands, along hedge rows, at the edge of forested areas, at the edge of private roads or driveways, and within non-prime forested areas.

We conclude that the credible evidence presented at trial showed that Applicants' proposed development does not present the appearance of strip development. Applicants have designed the new building on Lot 1 to have the same exterior treatments as their nearby home. In an effort to reduce the aesthetic impacts of their development upon the neighbors, Applicants have proposed to maintain the existing trees on the front and sides of their property, and to plant many more trees that, after six and more years of growth, will provide significant (although not complete) screening from their new development. While Applicants' proposal to develop the front portion of their property has raised significant concerns for their neighbors, they have conscientiously planned the development they desire while also preserving and restricting from future development the portion of their property that hosts forested, undeveloped natural areas along the Browns River. We therefore conclude that

Applicants' proposed development conforms to the "special provisions" of Zoning Regulations § 3.6.6(1).

Zoning Regulations § 4.7.3(5) limits the development of a Mixed Use PUD unless it is "an effective and unified treatment of the development possibilities of the project site, and the development plans make appropriate provision for preservation of water resources identified in the [WRO] District . . ." We find that the proposed subdivision and development represent effective and unified treatment of the development possibilities of the project site, and make appropriate provisions for the preservation of water resources in or on the WRO District, steep slopes, and soils that are otherwise unsuitable for development.

Based upon all of the above, we conclude that Applicants' proposed subdivision and development conforms to Subdivision Regulations §§ 6.2.1 and 6.2.2 and Zoning Regulations §§ 3.6.6(1) and 4.7.3(5).

*Question 9*: *Conformance to Subdivision Regulations § 7.1.4(5) and Zoning Regulations §§ 4.4.4(1) and (2), Vehicular Access and Parking.*

By their Question 9, Appellants seek to challenge the sufficiency and propriety of the vehicular access, safety, circulation, and parking for the proposed project. Incorporated into this Question and the regulatory provisions that it relies upon are issues of landscaping and screening. Subdivision Regulations § 7.1.4(5) addresses lot access and requires subdivisions to "meet the access requirements in the Site Plan Review Section 4.4. of the Zoning Regulations." Subsection 1 of Zoning Regulations § 4.4.4 addresses vehicle safety, while subsection 2 addresses the adequacy of circulation, parking, and loading facilities. Specifically, subsection 2 requires "[a]dequate space for maneuvering in and out of parking and loading areas" that do not interfere with traffic circulation to and within the site, parking areas that are "landscaped or screened from adjacent uses and from the roads," and prohibits parking areas from the front, side, and rear yard setback areas." Zoning Regulations § 4.4.4(2). The DRB may waive these requirements on a case by case basis if they conflict with other requirements in § 4.4. Id.

Based upon the credible evidence offered at trial, we conclude that Applicants proposed development satisfies the vehicular access, safety, circulation, and parking standards, subject to the conditions we impose below.

To accommodate the inspection and minor repair of large tanker trailers, as well as receive and send out deliveries of the large boxes containing monofilament spools and other supplies, Mr. Pelkey and his co-workers need a large gravel area for the trucks and trailers to park, turn around, and back into the Lot 1 building. Applicants have therefore proposed a large gravel area on a significant portion of Lot 1, including along the west, east, and south sides of the proposed building and near the frontage along Route 128. Additionally, Applicants propose to plant many additional trees near their northern and western borders, the latter being along Route 128. See Pelkey Exhibits H, I, and O. These trees, particularly because they will be planted when they are about six feet tall and will grow by an average height of one foot per year, will, after several years of growth, provide significant screening for Applicants' proposed Lot 1 building.

While this proposal is landscaped to screen parking from the road and will provide adequate space for maneuvering, it appears to contradict a specific provision of Zoning Regulations § 4.4.4(2)(c), which prohibits parking in a front yard. However, this prohibition may be waived "on a case by case basis if parking requirements conflict with other" site plan requirements. Zoning Regulations § 4.4.4(2)(c).

As we stated above in our discussion of Appellants' Question 7, the general conditions for site plan review of Mixed Use PUDs allows and even directs the "appropriate provision for preservation of" natural and water resources. Zoning Reg. § 4.7.3(5). By concentrating development to the front of their property, Applicants have presented a development plan that allows them to preserve the natural and water resources on the rear portion of their land, some of which is within the WRO and FHO Districts. We find the requirements under Zoning Regulations § 4.7.3(5) sufficient to override those under § 4.4.4(2)(c).

In regards to safety concerns under subsection 1, Applicants presented undisputed evidence, in the form of a communication from the Town of Westford Fire Department, that Applicants' site plans "appear to exceed the town's vehicle access standards." (Pelkey Exhibit F at 19). The Fire Department official concluded that the "fire department agrees to a waiver allowing the applicant to vary from the town vehicle access standards in favor of the stronger

standards proposed" by Applicants. Id. These representations concerning the safety of Applicants' proposed driveway improvements were undisputed at trial.

The credible evidence convinces us that, particularly in light of the conditions proposed by Applicants and the additional conditions imposed by the Court, Applicants proposed subdivision and development conforms to the vehicular access, safety, circulation, parking, and landscaping standards established in Subdivision Regulations § 7.1.4(5) and Zoning Regulations §§ 4.4.4(1) and (2). We therefore answer Appellants' Question 9 in the affirmative.

*Question 11: Conformance to site plans standards in Zoning Regulations § 4.4.4(3).*

By their Question 11, Appellants challenge the adequacy of Applicants' proposed landscaping and screening. Zoning Regulations § 4.4.4 provides specific standards for site plan review; subsection 3 directs how landscaping and screening must be considered in a proposed development plan. Specifically, subsection 3 directs the DRB to pay particular consideration to:

> preservation of existing vegetation and important features of the site, including large trees, views and vistas, fences, stone walls, and shrubs; visibility of unsightly or incompatible areas from the road and adjoining properties; and the adequacy of the landscaping materials to meet seasonal conditions, soil conditions and erosion control, and light on the site.

As noted above, Applicants propose to maintain the existing trees and landscaping on their property, which will provide substantial, although not complete screening for the Lot 1 building and its uses and the uses that will continue on Lot 2. Additionally, Applicants have proposed to plant and maintain a significant number of new trees along their western and northern boarders. Applicants also pledge that the forested areas along the eastern portion of their property will remain undeveloped. We have already addressed how this portion of Applicants' plans conforms to various provisions in the Subdivision Regulation, Zoning Regulations, and Town Plan. We find further support in Zoning Reg. § 4.4.4(3), since Applicants' conservation commitments will also provide significant screening of their development for viewers from the east.

It is a bit more difficult to increase the screening for Applicants' property for viewers from the south, due to the lay of the land, which falls away in a downward slope after crossing Applicants' southern boundary, but then rises again, so as to provide southerly neighbors with

an overlooking view of Applicants' property. There are, however, some trees on Applicants property near and parallel to Applicants' southern boundary and these trees will continue to provide some screening of Applicants' existing and proposed development. Even though the adjoining property to the south serves as a residence from which Applicants' development will be seen,[6] we conclude that the lay of the land will cause additional landscaping to serve little purpose. Neighbors further to the south may also be able to view Applicants' development, although the distance between their properties will minimize the visual impacts of Applicants' additional development. We therefore conclude that no further landscaping than that proposed by Applicants is necessary under Zoning Reg. § 4.4.4(3)(b).

Applicants' planting and landscaping plans take into consideration all the directives listed in subsection (a) through (g) of Zoning Regulations § 4.4.4(3). For all these reasons, we conclude that Applicants' proposed development plans conform to Reg. § 4.4.4(3) and, based upon that conclusion, we answer Appellants' Question 11 in the affirmative.

*Question 12*: *Conformance to conditional use standards in Zoning Regulations § 4.3.5.*

By their Question 12, Appellants question Applicants' proposed development under general conditional use standards. Since Applicants wish to use the proposed Lot 1 building for two uses that are listed as conditional uses in the AFR II District, Applicants' proposed development must receive conditional use approval. See Zoning Reg. §§ 3.6.3(1), (15) (listing "automotive repair" and "small scale industry" as allowable uses in the AFR II District, subject to conditional use approval).

Zoning Regulations § 4.3.5 establishes the general standards to be used in a review of a conditional use approval application and provides that conditional use approval may only issue for a project that "will not adversely affect" eight specific interests that the Regulations seeks to protect.

Before we review each of those eight general standards, we believe it important to note that "adversely affect" is a term of art often used in land use regulation. Municipal land use regulations often use several similar terms that initially appear to require different standards:

---

[6] The adjoining property along Applicants' southern boundary is owned by Mr. and Mrs. Koll-Bensen. Neither Mr. nor Mrs. Koll-Bensen has chosen to participate in these land use appeals.

impact, adverse impact, and undue adverse impact. In connection with the Permit Reform Act of 2004, the statute that authorizes municipalities to allow for conditional uses was amended to require that conditional use approval may only be granted when a determination has been made that "the proposed conditional use shall not result in an <u>undue adverse effect</u> on" specified community attributes or interests. 24 V.S.A. § 4414(3)(A) (emphasis added). The former enabling statute, then codified in 24 V.S.A. § 4407(2), appeared to employ a lesser standard, using only the term "adverse affect."

Many municipalities continue to employ the "adversely affect" standard that was superseded by the Permit Reform Act of 2004. But the change from "adverse affect" under 24 V.S.A. § 4407(2) to "undue adverse affect" under § 4414(3)(A) evinces a distinction without a difference, since our Supreme Court has held "that the adverse effect test must be applied reasonably to prohibit only substantial and material adverse effects." In re Miller, 170 Vt. 64, 69 (1999) (citing In re Walker, 156 Vt. 639, 639 (1991) (mem.)). We therefore proceed with our analysis of Applicants' proposed development with an obligation to determine whether that development will cause "substantial and material adverse effects" upon the characteristics itemized in Zoning Reg. § 4.3.5.[7]

The first itemized consideration under § 4.3.5 is the impact upon the "capacity of existing or planned community facilities or services." The credible evidence indicated that there would be no adverse impact on this criterion. In fact, a Town Fire Department official advised that Applicants' proposed improvements to the driveway serving both Lots 1 and 2 will exceed the road safety standards. Since no evidence was presented to contradict this evidence, we have adopted it for purposes of our analysis here.

---

[7] To further guide our analysis of whether a proposed development will cause an "undue adverse effect" upon a community, we have employed the multi-step analysis first developed by the former Vermont Environmental Board in Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law and Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985). While the Board employed that analysis in considering a state land use permit application, we note that we have employed the Quechee analysis as guidance in the context of a municipal land use permit application and the Vermont Supreme Court has approved us doing so. In re Group Five Invs. CU Permit, 2014 VT 14, ¶ 14–15. We have chosen here to limit our analysis to the first step in the Quechee analysis, since the credible evidence has caused us to conclude that no adverse impacts occur. If our determination had been that the proposed development may cause an adverse impact, then we would have continued with our analysis under Quechee to determine whether the supposed adverse impact would be "undue." Since our conclusion is that the proposed development will not cause an adverse impact, our analysis ends there.

The second consideration is the impact upon character of the area affected. As described above in relation to Subdivision Reg. § 6.1.6, Applicants proposed development is consistent with the character of its surroundings. While the Town is generally rural in character, the area near Applicants' property represents the most developed area in Town. Furthermore, several nearby properties, including the immediately adjacent property to the north, host commercial enterprises on and within view of Route 128 travelers. The three properties immediately to the south of Applicants' property host residences and home occupations that are set as far back from Route 128 as Applicants' home. Although Applicants' proposed Lot 1 building will be much closer to Route 128 than those homes and accessory buildings, the area neighborhood includes several commercial buildings that are as close to Route 128 as the proposed Lot 1 building. Finally, while the specific businesses that Mr. Pelkey will operate out of the Lot 1 building are unique, they are within the types of uses allowed as conditional uses in the neighborhood and zoning district. We therefore conclude that the proposed development will not have an adverse impact upon the neighborhood, area, or district affected.

The third consideration is the impact upon traffic on roads in the vicinity of the proposed development. Credible evidence suggests that Applicants' proposed increase in uses will only bring nominal additions to the traffic that already flows along Route 128 in this neighborhood. We therefore conclude that the additional traffic from this development will have no adverse impact upon area traffic.

The fourth consideration directs us to consider the objectives of the Town Plan and regulations in effect. As we have previously addressed, the proposed subdivision and development does not conflict with and actually complements the stated objectives of the Town Plan and all applicable town regulations.

The fifth and sixth considerations relate to the utilization of renewable energy resources and existing water supplies and aquifers. Applicants propose to complete the construction and use of their new development in an efficient manner, employing renewable energy resources where practical. By relocating their existing businesses, now operated in another town, to their home property, Applicants will reduce their need to travel area highways and their use of fuel

products.  Apart from these environmentally positive outcomes, the project will have no effect on the use of renewable energy resources.  Additionally, because potable water will be supplied to the building by an on-site well, any resulting wastewater will be treated by an on-site wastewater treatment system, and no petroleum products, fuel oil, or other hazardous materials will be allowed to enter the on-site wastewater treatment system, we conclude that the proposed project will have no discernible impacts upon area water supplies or aquifers.

The seventh consideration, which asks us to consider a proposed development's impact upon "primary agricultural and forestry soils, significant natural areas, wildlife habitat, greenways, and water resources, as designated in the Town Plan," has already been addressed above.  Because of the already stated conclusions, we further conclude that the project as proposed will not have an adverse effect upon these designated resources.

Lastly, we are directed to consider any significant and material adverse impacts on surrounding uses.  While we recognize that Applicants' development will bring some change in appearance when viewed from nearby neighbors' homes, we note that much of their new development will be screened by existing and additional trees and landscaping on the property. Furthermore, the exterior appearance of Applicants' proposed new building on Lot 1 will be similar to Applicants' existing home.  Finally, no credible evidence was presented that Applicants' proposed subdivision and development will interfere with existing or potential uses. For these reasons, we conclude that the proposed project will not have an adverse impact upon any use that could be approved under the Zoning Regulations, nor on any existing use of adjacent properties.

For all these reasons, we conclude that the proposed subdivision and development conforms to Zoning Regulations § 4.3.5.  In light of our determinations here, we answer Appellants' Question 12 in the negative: the proposed subdivision and development will not have a substantial or material adverse impact under the general standards codified in Zoning Reg. § 4.3.5.  See In re Miller, 170 Vt. 64, 69 (1999).

*Question 13*:  *Conformance to specific conditional use standards in Zoning Reg. § 4.3.6.*

By their Question 13, Appellants challenge Applicants' proposed development under specific conditional use standards.  Section 4.3.6 provides specific standards to employ in the

review of Applicants' conditional use approval application. Much like its immediate predecessor, § 4.3.6 provides an itemization of seven standards that we must use in our review. The credible evidence presented provides us with a foundation to conclude as follows related to each of the seven specific standards.

The first specific standard provides that approval must be denied for any proposed development that causes "obnoxious or excessive noise, smoke, vibration, dust, glare, odors, electric interference or heat that is detectable at the boundaries of the lot shall not be generated." All new commercial activity proposed for Applicants' property will take place within the new building, other than the occasional backing up of trucks and trailers, some of which will be equipped with back up alarms. These backup alarms will be faintly discernible at the boundary lines but will occur infrequently, given the relative low number of tanker trailers that will be worked on—about 36 tanker trailers per year, with no more than four tanker trailers to be on Lot 1 at any given time. Given these characteristics, we conclude that the proposed development will not cause any of the adverse impacts listed above at its boundaries. So as to assure that even the slightest disturbances will be minimized, Applicants have pledged that they will limit the hours of operation for their businesses in the Lot 1 building to Monday through Friday, 8:00 AM to 4:00 PM, with only personal, non-business activities on Saturdays and no activities on Sundays.

The second standard restricts signage and outside displays. No signs or outside displays are proposed. The only additional lighting to be installed will be downcast and its purpose will be for security only. Existing lighting on the Lot 2 home and garages is minimal and is used for security purposes only. We therefore conclude that the proposed development conforms to this subsection.

Specific standard three requires goods, parts, supplies, vehicles or machinery to be stored inside or behind appropriate screening. All goods and materials stored on Lot 1 will be inside the new building; there will be no outside storage on Lot 1, except for the few (four or less) tanker trailers awaiting inspection or pick up and the vehicles parked on site by employees

during business hours.[8]  Furthermore, the screening and landscaping provided is adequate to screen these trailers and buildings.  We therefore conclude that the proposed development conforms to this subsection.

Specific standard four prohibits fire, explosive, or safety hazards that significantly endanger other property owners or emergency personnel.  The owners of the tanker trailers delivered to Lot 1 for inspection will be directed to assure that all fuel has been removed from the tanker prior to delivery.  Mr. Pelkey did admit at trial that there have occasionally been tankers that arrived with some fuel remaining.  Because of this possibility, though rare, we will require that Applicants' establish, maintain, and educate their employees on a hazard materials response procedure, including the need, when necessary to employ an independent hazard materials response contractor.  Because Applicants propose no fire, explosive, or safety hazards as part of their new development that will significantly endanger other property owners or emergency personnel, we conclude that specific standard four is met.

Specific standard five requires consideration of the scale of the project in relation to the scale of surrounding uses.  Applicants' proposed Lot 1 building will encompass 4,000 square feet and have a roof peak of up to 35 feet, which is similar to or smaller than several other nearby buildings.  Applicants propose that their new building will have an exterior appearance similar to that of their adjacent home and attached garage.  We therefore conclude that the proposed Lot 1 building is unlikely to have an adverse effect upon the continued enjoyment and access to existing and approved uses in the area.

Specific standard six limits the exterior storage of vehicles and equipment for commercial sale.  Because there will not be any outside storage of vehicles or equipment on Lot 1, other than employee vehicles and no more than four tanker trailers, we therefore conclude that specific standard six is met.

Finally, specific standard seven allows for increased setbacks for certain use categories. In light of the evidence supporting the setback waivers approved above, we conclude that there is no need for increased setbacks for the benefit of adjoining residential uses or districts.

---

[8]  Applicants propose to store mounds of earth materials outside on Lot 2, and there was some suggestion at trial that these mounds may be temporarily stored on Lot 1.  We address these outside storage proposals in the section below concerning Applicants' application to amend their home occupation permit.

Furthermore, the side yard setbacks for the new building exceed the minimum side yard setbacks in the AFR II District.

For all these reasons, we conclude that the proposed subdivision and development conforms to Zoning Reg. § 4.3.6. In light of our determinations here, we answer Appellants' Question 13 in the affirmative; the proposed subdivision and development meets the specific conditional use standards of Zoning Reg. § 4.3.6.

*Question 14: Conformance to Zoning Reg. §§ 3.6.3 and § 4.7.6, Conditional Uses.*

By their Question 14, Appellants challenge Applicants' proposed development's compliance with approved conditional uses. Zoning Regulations § 3.6.3 allows automotive and machinery repair services less than 3,000 square feet and small scale industry in structures less than 4,000 square feet. Zoning Reg. §§ 3.6.3(1) & (15). As we have previously noted, Applicants propose to locate two separate businesses within their new Lot 1 building. Their tanker inspection business fits within the term "automotive repair business" that is defined as an allowable conditional use within the AFR II District and will occupy approximately 2,000 square feet of the new building. Zoning Reg. § 3.6.3(1). Their second business, the cleaning and restoring for reuse of monofilament spools, fits within the term "small scale industry" that is defined as an allowed conditional use within the AFR II District and will occupy the remaining 2,000 square feet of the new building. Zoning Reg. § 3.6.3(15). We conclude that both business uses are allowable as conditional uses and therefore comport with Zoning Reg. § 3.6.3.

Since Applicants' propose their development as a Mixed Use PUD, they must also comport with the provisions of Zoning Reg. § 4.7. Appellants' Question 14 specifically challenges whether Applicants' proposed project is permitted under Subsection 6, which directs that developments proposed as a Mixed Use PUD may only be permitted if that use is "permitted as of right or conditionally" in certain zoning districts, including the AFR II District. Since we've already determined that Applicants' proposed uses are conditionally allowable, pursuant to Zoning Reg. §§ 3.6.3(1) and (15), we also conclude that Applicants' proposed uses are allowable as a Mixed Use PUD.

For these reasons, we answer Applicants' Question 14 in the affirmative: Applicants' proposed uses are permitted pursuant to Zoning Reg. §§ 3.6.3 and 4.7.6.

*Question 15:  Conformance to Zoning Reg. § 3.6.5.*

By their Question 15, Appellants challenge Applicants' proposed development's conformance with standards specifically for conditional uses in the AFR II District.  Section 3.6.5 requires that (1) proposed commercial uses must be proved to "provide for the needs of Westford residents, residents of nearby communities, tourists and special customers" and (2) the proposed use "will be of a scale appropriate for a rural community and not out of character with the scale of other uses in the Town of Westford."  Zoning Reg. §§ 3.6.5(1) and (2).  We have already addressed these legal questions in relation to Appellants' Questions 4, 5, 8, 12, and 13.

While Appellants have attempted to characterize Applicants' commercial uses as not providing for the needs of Town residents, we conclude that this is not a fair characterization.  Applicants' commercial enterprise assists in the safe transportation of fuels that are used every day by town and nearby residents, and Town residents, those in nearby communities, and visiting tourists benefit from the safe and steady transportation of petroleum products.  Applicants' second commercial enterprise is somewhat unique, but both businesses will provide employment opportunities for up to ten nearby residents.  It is an innovative business that keeps business activity in Northern Vermont, rather than in some out-of-state location.  Other than the infrequent truck traffic, employment opportunities, and economic activity it brings to Mr. Pelkey and his employees, the spool cleaning business appears to bring no negative impacts to this community.

For these and other reasons stated in previous sections, we conclude that Applicants' proposed development meets the additional conditional use standards set forth in Zoning Reg. § 3.6.5.

*Question 19:  Conformance to Subdivision Regulations § 4.14.*

By their Question 19, Appellants raise a challenge as to compliance with the requirement that certain subdivisions undergo review by the Conservation Commission and that the DRB consider the Conservation Commission's comments and recommendations.  Section 4.14 requires the Town Conservation Commission to review the impacts of a subdivision on (a) primary agricultural soils; (b) primary forest soils; (c) wildlife habitat; (d) any

significant natural areas; or (e) sites of any proposed greenways. Specifically, Subdivision Regulations § 4.14 directs that the Planning Coordinator present a copy of any proposed subdivision plan that may impact these designated interests to the Conservation Commission prior to the preliminary plat review proceeding, and also directs the Development Review Board to consider any and all comments from the Conservation Commission as they review that preliminary plat application.

In this Question, Appellants did not seek to assert that Applicants' proposed subdivision and development will adversely impact the listed important natural resources; Appellants raised that argument in their earlier Questions. Rather, by this Question, Appellants assert that the procedure directed by § 4.14 was not followed here, thereby negating the approval conferred by the DRB. Appellants also alleged at trial that, since the Conservation Commission was not properly consulted, this Court is foreclosed from approving Applicants' subdivision application.

This Question appeared to at least present a disputed statement of facts, and that was why we ultimately declined to grant Applicants' prior motion for summary judgment. See Pelkey Final Plat Major Subdivision, No. 172-12-12 Vtec, slip op. at 2–3 (Vt. Super Ct. Envtl. Div. Nov. 6, 2013) (Durkin, J.). But at trial, it became clear that Appellants' concerns were based upon a misunderstanding of what the Planning Coordinator represented. At trial, the Planning Coordinator testified that she had submitted Applicants' subdivision proposal to the Conservation Commission prior to the DRB's review of Applicants' preliminary plat application. The Conservation Commission, according to the Planning Coordinator, chose not to offer any objections or other comments in response to Applicants' preliminary plat application. As an added precaution, the Planning Coordinator also submitted Applicants' final plat application to the Conservation Commission, but again the Commission chose not to offer objections or other comments in response.

The Planning Coordinator's representations were not contradicted at trial. Based upon her credible testimony, we can only conclude that the Conservation Commission was provided with both of Applicants' preliminary and final plat applications, prior to the DRB's review of

each application, and that the Commission chose not to offer comments in response to Applicants' applications.

Based upon these conclusions, we conclude that Zoning Regulations § 4.14 was adhered to and satisfied.

**B. Docket No. 30-3-12 Vtec:  home occupation permit amendment application.**

Finally, we turn to Applicants' remaining request: that they be allowed to store piles of earthen materials on their proposed Lot 2.  To receive approval for this use, Applicants submitted an application for an amendment to their existing home occupation permits.  A copy of their home occupation permit amendment application was admitted at trial as Pelkey Exhibit R.  Appellants object to this request and have submitted a Statement of Questions that lists four Questions as the basis for their objection.  We address each Question in turn.

*Question 1*:  *Was the application properly warned prior to the Zoning Administrator's decision?*

Appellants first Question raises a procedural challenge to the DRB's approval.  Pursuant to the applicable provisions in the Zoning Regulations (§ 4.3.2) and applicable state statute, Applicants first submitted their application for a home occupation permit amendment to the Town of Westford Zoning Administrator ("Zoning Administrator").  The testimony at trial, which was undisputed, was that the Zoning Administrator posted notices of the pending application.  When the Administrator denied that application, Applicants appealed that determination to the DRB.  Applicants' DRB appeal was properly warned for hearing on January 25, 2012; the warning was published in the Burlington Free Press on January 3, 2012.  Town Exhibit iii at 2.

Based upon this uncontested evidence, we answer Appellants' Question 1 in the affirmative:  Applicants' home occupation permit amendment application was properly noticed.

*Question 2*:  *Conformance to Zoning Regulations § 5.4.*

Appellants' second question challenges Applicants' proposed development's conformance with provisions regarding home occupations.   Home occupations are governed by Zoning Regulations § 5.4, which lists nine standards of review.  Before we address those nine standards, we first must clarify what is within the scope of our review: Applicants previously received approvals to construct and use their home, attached garage, separate garage, and

temporary garage, all of which are shown on their site plan. See Pelkey Exhibit H. Since those construction and use permits have already been granted and were not successfully appealed, they have become final and may not be challenged in this Docket. 24 V.S.A. § 4472(d).

With this in mind, we limit our review to the use that Applicants propose in this application, and to only that use: the storage of dirt piles, totaling no more than fifteen loads of material, none of which will be more than six feet high. Mr. Pelkey was uncertain on where exactly on his property he would locate the dirt piles, although he later agreed during trial to locate them behind his home, which is to the east. He was also uncertain of the exact size of each dirt pile, although he offered the limitation at trial that the piles would be no more than six feet high. He did not offer any additional screening or landscaping for this outside storage, and he confirmed that all of the dirt piles will be located outside of his home and accessory structures.

For the following reasons, we find that the storage of dirt piles does not comport with several of the home occupation standards in § 5.4 and therefore **DENY** the permit amendment for Applicants' expansion of his home occupation activities.

First, Mr. Pelkey's dirt pile storage appears to be out of character with other home occupations in this neighborhood. Zoning Reg. § 5.4. His proposed activities do not even appear to be reasonably defined as a "home occupation," as articulated in § 8.2, but rather as an additional commercial operation on the proposed Lot 2. In fact, Mr. Pelkey testified at trial that several of his employees and perhaps even his customers would be delivering, moving, and removing the dirt piles from Lot 2. This does not conform with subsection 2, which requires that the home occupation activities be "carried on wholly by members of the family living" in the home. Mr. Pelkey's proposed dirt storage also appears to violate Subsection 7, which requires that "[e]xterior storage of materials used in the home occupation shall be minimal, [and] reasonably screened from adjoining properties . . . ." Zoning Reg. § 5.4(7). While there is existing screening along the side yard boundaries, it is sporadic and not sufficient to screen this proposed exterior storage of dirt.

Lastly, the theme or tenor of allowable home occupations appears best expressed by the last listed standard, which requires that a "home occupation shall occupy a minor portion of

the dwelling or an accessory structure." Zoning Reg. § 5.4(9). We understand this provision to restrict home occupation businesses to those that are often seen in rural Vermont towns, such as where an accountant, bookkeeper, lawyer, or hairstylist may have an office in a minor portion of their home or accessory structure. That is not to say that more significant businesses would not be allowed under these or other zoning regulations; it simply means that they cannot be defined as part of a home occupation. Applicants' proposed expansion is wholly outside of their home and accessory structures.

Finding that Applicants' proposed expansion does not conform to at least three of the nine standards in § 5.4, we therefore conclude that Applicants' proposed home occupation permit amendment application must be denied. While our determination here is dispositive of the pending application, we continue our analysis of Appellants' Questions, as there are only two remaining, both of which were the subject of substantial testimony and oral arguments at trial.

*Question 3: Storage of excavation business vehicles and equipment.*

Appellants complain via this Question about the propriety of the Pelkeys' use of Lot 2 for the continued storage of excavation business equipment and vehicles. But we decline to answer this Question, as is does not pertain to the pending application. Much reference was made during trial to the prior permits that the Pelkeys received for the construction of their garages, particularly those where Mr. Pelkey currently stores several pieces of excavation equipment and other vehicles. But even a determination here of whether the prior permits allow for this storage, whether as part of a home occupation or otherwise, would be improper, since that question does not relate to the pending application. We therefore decline to answer this Question 3.

*Question 4: Trucking and storage of earthen materials as part of a home occupation.*

By this final Question, Appellants appear to repeat the legal issues raised by their Question 2, which we have already addressed above by concluding that the outside storage of dirt piles in unscreened locations does not conform to several of the home occupation standards of Zoning Reg. § 5.4. We therefore also answer this final Question in the negative, since we cannot conclude that the trucking and outside storage of earthen materials can be

regarded as a home occupation, as that term is defined by the standards established in Zoning Reg. § 5.4.

## III.  Conclusions

For all the reasons expressed in the immediately preceding pages, we conclude that Applicants Theodore and Michelle Pelkey's application for an amended home occupation permit in Docket No. 30-3-12 Vtec must be **DENIED**.

In regards to the applications pending in Docket No. 172-12-12 Vtec, we conclude that Applicants' applications for final subdivision plat, Mixed Use PUD, conditional use, and site plan review are **APPROVED**, subject to the following conditions:[9]

1.  The turning radius or flare for the north side of the access onto VT Route 128 must increase to the minimum requested radius required by the Vermont Agency of Transportation prior to submitting the approved site plan and recording the approved survey plat.  However, the location of the throat and southern edge of the access shall remain the same.

2.  Prior to recording the mylar, Applicants shall obtain all permits required by the State of Vermont.

3.  When the mylar is recorded in the Town of Westford Land Records ("Land Records"), the *Declaration of Covenants, Conditions, and Restrictions* and the *Notice of Conditions of Subdivision Approval* shall also be recorded in those Land Records.

4.  The *Declaration of Covenants, Conditions, and Restrictions* shall not be revised, changed and/or amended by the owners of Lot 1 and/or Lot 2 without prior approval from the DRB.

5.  All land development shall be located within the approved building envelopes.

6.  No construction or site improvements on Lot 1 may occur until a zoning permit has been obtained from the Zoning Administrative Officer.

7.  Prior to the issuance of the first zoning permit for Lot 1, the mylar shall be recorded in the Land Records.

8.  All rights-of-way and easements depicted on the approved mylar shall be conveyed at the time of property transfer.

9.  Prior to the issuance of the first zoning permit for Lot 1, a letter from a licensed surveyor shall be submitted to the Administrative Officer certifying that all boundary markers have been set in accordance with the approved mylar.

---

[9]  We have incorporated some of the conditions imposed by the DRB in their November 14, 2012 decision so as to provide a complete listing of the conditions imposed upon this subdivision and development.

10. Prior to the use of Lot 1 and/or occupancy of the structure on Lot 1, a certificate of occupancy shall be obtained from the Administrative Officer.

11. Prior to the issuance of the certificate of occupancy for Lot 1, the structure shall be constructed in the same design and finish materials as the primary structure on Lot 2. The structure shall have a concrete foundation, exterior vinyl siding of similar color to the structure on Lot 2, neutral colored metal roofing, residential type vinyl windows, and residential type exterior doors.

12. Prior to the issuance of the certificate of occupancy for Lot 1, copies of all State certification letters and of all State permits, such as wastewater and potable water supply and stormwater, for this project shall be submitted to the Westford Administrative Officer.

13. Prior to the issuance of the certificate of occupancy for Lot 1, a letter from a licensed engineer shall be submitted to the Administrative Officer certifying that the shared driveway on Lot 1 and Lot 2 conforms to the approved standards as depicted on the approved site plan and document titled "Paved Access Drive Typical Cross Section." However, the portion of the shared driveway on Lot 2 is not required to be paved.

14. The shared driveway shall be maintained by the Owners of Lot 1 and 2 to the approved standards as depicted on the approved site plan and document titled "Paved Access Drive Typical Cross Section." However, the portion of the shared driveway on Lot 2 is not required to be paved.

15. Prior to the issuance of the certificate of occupancy for Lot 1, the parking area on Lot 1 shall be constructed to the standards set forth in the approved site plans and document titled "Gravel Parking Area Typical Cross Section."

16. The parking area on Lot 1 shall be maintained to the standards set forth in the approved site plans and document titled "Gravel Parking Area Typical Cross Section."

17. Prior to the issuance of the certificate of occupancy for Lot 1, all approved stormwater infrastructure shall be constructed in accordance with the site plans.

18. All approved stormwater infrastructure shall be maintained according to the site plans.

19. Prior to the issuance of the certificate of occupancy for Lot 1, all landscaping shall be installed according to the approved site plan. More specifically, there shall be eight (8) cedar and eleven (11) white pine and/or blue spruce located on the northern property boundary of Lot 2, twenty six (26) cedar located on the southern property boundary of Lot 2, sixteen (16) white pine and/or blue spruce located on the northern property boundary of Lot 1, fifty one (51) cedar and twenty five (25) white pine and/or blue spruce located on the western property boundary of Lot 1, and twenty seven (27) cedar located on the southern property boundary on Lot 1.

All of the foregoing landscaping vegetation to be installed shall be five (5) to six (6) feet in height after installation.

20. All approved landscaping shall be maintained in perpetuity.

21. Prior to the issuance of the certificate of occupancy for Lot 1, Applicants shall submit to the Westford Fire Department a list of all potential hazardous materials to be located within the building, along with the approximate maximum amount of said materials to be located on site at one time.

22. Applicants shall draft a designated hazardous materials spill response procedure and submit it to the Town of Westford Fire Department for review, comment, and approval. The Fire Department approval shall be received prior to the issuance of the certificate of occupancy for Lot 1. Applicants shall maintain a copy of the hazardous materials spill response procedure in a visible location within the Lot 1 building and shall educate all employees on the approved procedures.

23. There shall be no signage advertising and/or directional signage and/or exterior displays on Lot 1. Applicants shall submit the appropriate applications for amendment, if signage and/or exterior displays are desired.

24. There shall be no exterior storage, except for employee vehicles, vehicles serviced by the tanker repair and EPA certification (automotive repair) business, tractor trailers awaiting pick up for the (small scale industry) monofilament recycling business, and one trash disposal dumpster located behind the building on Lot 1. All other material, equipment, and/or waste storage shall be located inside of the building located on Lot 1.

25. All automotive repair and/or small scale industry operations shall be carried out inside of the building on Lot 1. The outside of the building shall only be used for parking and storage of vehicles associated with said businesses, as depicted on the approved site plans.

26. All parking shall be located in the designated parking areas as depicted on the approved site plans and all vehicles parked in an orderly manner on Lot 1.

27. Unused and/or unregistered vehicles shall not be stored on-site on Lot 1 for more than thirty (30) days.

28. On Lot 1, there shall be a maximum of six (6) employees operating the automotive repair and small scale industrial businesses.

29. Use of Lot 1 shall not exceed a maximum of twenty two (22) vehicle trip ends per day.

30. There shall be a maximum of ten (10) vehicles, including but not limited to employee vehicles, trucks, tractor trailers, and/or tankers permitted to be parked on Lot 1 at one time.

31. There shall be no noise, smoke, vibration, dust, glare, odors, electrical interference, and/or heat generated by operations and detectable at the property boundary,

with the exception of reverse signals from trucks maneuvering within the parking area on Lot 1.

32. Vehicles shall not idle on Lot 1.

33. All waste associated with or created as a part of operations on Lot 1 shall be disposed of properly and in a timely manner. Operations shall not create unsafe conditions in the opinion of the Westford Fire Department with regard to combustible and/or explosive materials on Lot 1.

34. There shall be no oil and water separator installed on Lot 1 without conditional use and site plan amendment approval.

35. Lot 2 shall be subject to the following restrictions with respect to that portion of the lot designated as open space. The purpose of this open space easement is to retain the rural character of said lands and to preserve them in their natural, scenic and open condition and in so doing conserve, protect, sustain and maintain their aesthetic, agricultural and ecological condition.

    i. The Open Space shall be used for its approved purpose and shall not be further subdivided or developed, with the exception of recreational and/or agricultural facilities approved by the Administrative Officer.

    ii. There shall be no filling, excavating, and dredging, mining or drilling, removal of topsoil, sand, gravel, rock, minerals or other materials.

    iii. The owner may maintain the Open Space in an orderly and presentable manner including planting shrubbery from time to time and keeping the grass trimmed and taking any other normal course of action to maintain the pleasant appearance of the Open Space. Notwithstanding this ability to maintain, there shall be no activities or uses of the Open Space which will or could be detrimental to drainage, flood control, water conservation, fish and wildlife or habitat preservation.

    iv. There shall be no dumping of ashes, trash, garbage, junk, or other unsightly or offensive material.

    v. The Applicant shall be permitted to alter the topography for maintenance purposes, if the proposed change in topography conforms to the purpose and intent of this Open Space Agreement, the decision approving the final plat, and all zoning and subdivision regulations, and has received approval from the Administrator Officer.

    vi. Nothing herein shall prohibit the use of the Open Space area for the purposes set forth in Section 3.7.3 of the Town of Westford Zoning Regulations, adopted February 2011. Any portion of the Open Space located within the Water Resources Overlay District or the Flood Hazard Overlay District shall be used and managed in accordance with Section 3.7 of the Town of Westford Zoning Regulations, adopted February 2011, and Section

3.8 of the Town of Westford Interim Zoning Regulations, adopted August 2011, as may be subsequently amended.

vii. The use of recreational motorized vehicles shall be permitted, provided that such use does not adversely impact the Open Space lands and their drainage.

36. Ledge outcropping shall not be disturbed and/or developed.

37. Applicants' lands within the Water Resource Overlay and Flood Hazard Overlay Districts shall not be disturbed and/or developed.

38. Steep slopes shall not be disturbed and/or developed.

39. All utilities shall be located underground.

40. This project shall comply with the *Low Risk Site Handbook For Erosion Prevention and Sediment Control.*

41. Applicants shall provide a full copy to the Town Zoning Administrator of all plans admitted as exhibits in these coordinated appeals.

42. This project shall be completed, operated, and maintained as set forth in the approved plans and exhibits and on file in the Town Office, and in accordance with the conditions of this approval.

43. No changes, erasures, modifications, or revisions other than those required by this decision shall be made on the subdivision plat after Final Plat approval, unless said plat is first submitted to and approved by the Development Review Board. In the event the subdivision plat is recorded without complying with this requirement, the plat shall be considered null and void.

44. Two copies of the approved full-to-scale site plans and two copies of the approved full-to-scale plat shall be submitted to the Westford Planning Coordinator with the mylar, pursuant to Town of Westford Subdivision Regulations § 8.5.


This concludes the above captioned matters currently pending before this Court. A Judgment Order accompanies this Decision on the Merits.


Electronically signed in Burlington, Vermont on December 31, 2014, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Judge
Environmental Division